**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ANTONIETTA GUERRIERO, d/b/a APG ACCOUNTING SERVICES,** *Individually and on behalf of all others similarly situated*, | |
| Plaintiff, | **CASE NO.** 1:20-cv-11267 |
| v. | **JURY TRIAL DEMANDED INJUNCTIVE RELIEF SOUGHT** |
| **BANK OF AMERICA, N.A., NORTH SHORE BANK, A CO-OPERATIVE BANK,** and **TD BANK, N.A.,** | |
| Defendants. | |
| _____/ | |

## CLASS ACTION COMPLAINT

Plaintiff **ANTONIETTA GUERRIERO, d/b/a APG ACCOUNTING SERVICES,** through counsel, brings this Class Action Complaint and Demand for Jury Trial against Defendants **BANK OF AMERICA, N.A. ("Bank of America"), NORTH SHORE BANK, A CO-OPERATIVE BANK ("North Shore Bank"),** and **TD BANK, N.A. ("TD Bank"),** alleging claims for declaratory relief, unjust enrichment, conversion, money had and received, breach of contract, and the Massachusetts Consumer Protection Act. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and as to all other maters upon information and belief and the investigation of counsel.

## NATURE OF THE ACTION

1.      In March of 2020, as the SARS-CoV-2 virus—the virus that causes the COVID-19 disease (also called "coronavirus")—spread across the United States, Congress passed and President

Donald J. Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), a $2 trillion coronavirus response bill intended to speed relief across the American economy. As businesses shut down in compliance with state and local shelter-in-place orders—or simply in response to a severe decline in demand for services—millions of Americans lost their jobs and the stock market crashed. The CARES Act was intended to inject money into the economy and help keep businesses and individuals afloat during an unprecedented economic upheaval.

2.      Along with other provisions, the CARES Act created the Paycheck Protection Program ("PPP") to funnel forgivable loans to small businesses. The CARES Act initially authorized up to $349 billion in forgivable loans; that money quickly ran out, and Congress later authorized an additional $310 billion to the program.

3.      Small businesses were invited to apply for PPP funds starting April 3, 2020. Applicants could seek PPP loan funding through certain pre-approved Small Business Administration ("SBA") lenders or through any federally insured depository institution, federally insured credit union, or Farm Credit System institution that chose to participate.

4.      Lenders were compensated for their participation in the program through generous origination fees, paid by the government, that were tied to the amount of each loan. Lenders are eligible to receive (a) 5% for loans up to and including $350,000; (b) 3% for loans of more than $350,000 and less than $2,000,000; and (c) 1% for loans of at least $2,000,000. To receive these substantial origination fees, the lenders took on no risk (because the loan funds were provided by the government) and did little work. Instead, the lenders were paid for funneling money from the SBA to the small business applicants. Lenders were, however, required to certify under penalty of perjury that they were in compliance, and would remain in compliance, with PPP regulations.

5.      The amount of money offered to small business applicants was based on applicants' historical payroll information with specific limitations. But because the purpose of the program was

to make money available quickly, lending institutions were not required to independently verify applicants' representations. Instead, small businesses seeking PPP funding were required to make specific attestations and certifications under penalty of serious civil and criminal penalties, including imprisonment and hefty fines.

6.      Congress understood that in order to be able to make timely, truthful, and accurate representations in their PPP applications, many small businesses applying for PPP funding would rely on the assistance and expertise of professionals: accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other such agents (collectively, "Agents").

7.      To incentivize these Agents to assist small businesses with their PPP applications, Congress provided that Agents who assisted small business owners would be compensated through a fee of up to (a) 1% for loans of up to $350,000 (or up to $3,500 for loans in this tier); (b) 0.50% for loans of more than $350,000 and less than $2 million (or up to $9,999 for loans in this tier); or (c) 0.25% for loans of at least $2 million ("Agent Fees"). *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020) ("PPP Regulations").

8.      The PPP Regulations expressly require that Agent Fees be paid by the lending institution out of the origination fees the lender would receive from the SBA, and prohibit Agents from collecting fees from applicants or taking fees from the PPP loans.

9.      Defendants Bank of America, North Shore Bank, and TD Bank each profited handsomely from their involvement in the PPP.

10.     For example, Bank of America, one of the largest banks in the United States, was the first major financial institution to begin accepting PPP applications and is the second ranked lender in terms of net dollars of PPP funding provided in the country. As of June 27, 2020, Bank of America had received approval for 334,686 PPP loans, with an average loan size of $75,303, and funds totaling

over $25 billion.[1] Bank of America profited handsomely from its involvement in the PPP. Assuming the most conservative estimate, Bank of America received or is eligible to receive at least $250 million in origination fees from the SBA—and probably received more than that.

11.    Similarly, as of June 27, 2020, TD Bank—the sixth largest lender in terms of net dollars of PPP funds provided—had processed and funded at least 82,225 PPP loans, with an average funding amount of $102,851 and total funds of approximately $8.5 billion.[2] Again assuming the most conservative estimate, TD Bank received or is eligible to receive at least $84 million in origination fees from the first round of PPP funding alone.

12.    Upon information and belief, North Shore Bank, a prominent community bank serving primarily Massachusetts customers, also processed numerous PPP loan applications and received substantial payment from the SBA in the form of origination fees.

13.    Plaintiff Antonietta Guerriero is an accountant who assisted her small business clients with preparing and submitting PPP loan applications to Defendants. She helped three small businesses apply for funding through North Shore Bank, for a total of $999,800. She assisted one small business with an application to Bank of America, securing approximately $90,000. And she helped another small business client with an application to TD Bank, securing approximately $32,000.

14.    Yet despite clear direction from the SBA that the Agent fees "*will be paid by the lender out of the fees the lender receives from the SBA*," and despite certifying under penalty of perjury that it was in compliance and would remain in compliance with PPP regulations, Defendants have not remitted any Agent Fees to Plaintiff.

15.    Plaintiff is not alone in her predicament. Upon information and belief, each Defendant

---

[1] Small Business Administration, Paycheck Protection Program (PPP) Report (June 27, 2020), https://www.sba.gov/sites/default/files/2020-06/PPP_Report_Public_200627%20FInal-508.pdf [hereinafter "SBA PPP Report"] (last accessed July 6, 2020).
[2] SBA PPP Report.

has enacted a companywide policy to deny Agents the Agent Fees to which they are entitled. Not one of the Defendants implemented any process for identifying the Agents who assisted borrowers in obtaining PPP loans—likely hoping that the absence of such records would relieve them of the obligation to pay Agents their mandatory fees.

16.     Further, Bank of America has explicitly adopted a policy of denying Agents the Agent Fees to which they are entitled. Bank of America instead states on its website that, "[i]n the absence of a pre-loan approval written agreement between the agent and Bank of America, *Bank of America does not pay fees or other compensation to agents who represent or assist borrowers through the Paycheck Protection Program*."[3]

17.     Defendants' schemes, which directly contradict the mandate of the PPP Regulations, excluded Agents like Plaintiff from access to SBA funding

18.     Plaintiff, a sole proprietor, is also suffering from the economic downturn due to the coronavirus pandemic. She is entitled to the Agent Fees she earned by helping another business apply for a forgivable loan. Plaintiff and other Agents entitled to receive Agent Fees from Defendants have no other recourse to collect their compensation because the PPP regulations assign the responsibility for paying them to lenders alone, and prohibit them from collecting compensation from their clients.

19.     Ignoring this clear mandate, Defendants have refused to pay Plaintiff and other Agents—depriving them of much-needed funds during a time of severe economic hardship, even as Defendants enjoy a windfall.

20.     Plaintiff thus brings this Class Action Complaint to vindicate her rights and those of other Agents similarly situated, and to recover the Agent Fees to which they are entitled.

---

[3] Bank of America, CARES Act Paycheck Protection Program Frequently Asked Questions https://about.bankofamerica.com/promo/assistance/faqs/small-business-paycheck-protection-program (last accessed July 6, 2020).

**PARTIES**

21.     Plaintiff Antonietta Guerriero is a resident and citizen of Massachusetts. She is the sole proprietor of APG Accounting Services, a client accounting services practice.

22.     Defendant Bank of America, N.A. is a national bank with headquarters in North Carolina, making it a citizen of North Carolina.

23.     Defendant North Shore Bank, A Co-Operative Bank is a Massachusetts corporation with its headquarters in Peabody, Massachusetts, making it a citizen of Massachusetts.

24.     Defendant TD Bank, N.A., is a national bank with headquarters in Cherry Hill, NJ, making it a citizen of New Jersey.

**JURISDICTION AND VENUE**

25.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a different state than Defendant; (b) the claims of the proposed Class Members exceed $5,000,000 in the aggregate; and (c) none of the exceptions under that subsection apply.

26.     This Court has personal jurisdiction over Defendants because Defendants transact business and commit torts in this district as described herein.

27.     Venue is proper in this District because a substantial part of the events, acts, or omissions giving rise to the claim occurred in this District.

28.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the PPP Regulations.

**FACTUAL ALLEGATIONS**

29.     Beginning in December 2019, reports began to surface about a novel coronavirus spreading rapidly through Wuhan, China. By March 1, 2020, researchers concluded that over 9,000

people in the United States had already been infected and that the virus had been spreading, undetected, within the United States for six weeks.[4] The World Health Organization declared the COVID-19 outbreak a pandemic on March 11. On March 13, 2020, President Donald Trump declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia." California Governor Gavin Newsom issued a stay-at-home order on March 19, ordering the closure of most public spaces and nonessential businesses. California's order was followed by Illinois on March 21, New York on March 22, and dozens of other states and the District of Columbia in the days and weeks that followed.

30.     As the pandemic spread, millions of people in the United States lost their jobs as state and local stay-at-home orders forced businesses to close. Even in states where businesses were allowed to remain open, multiple sectors experienced economic devastation as consumers stayed home to try to counteract the spread of the deadly virus. Demand for goods and services plummeted.

31.     On March 25, 2020, in response to overwhelming pleas for assistance from state and local governments, businesses, and individuals, the United States Senate passed the CARES Act. The House of Representatives approved the bill the following day, and President Trump signed it into law on March 27, 2020. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020). The $2 trillion stimulus bill is the largest stimulus bill in American history.

32.     One of the cornerstones of the CARES Act is the $659 billion loan program for small businesses, the Paycheck Protection Program. *See id.* § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a) (2020)). In creating the PPP, the federal government recognized that "many small businesses

---

[4] *See* Cedars-Sinai,  Study Estimates COVID-19 May Have Infected Over 9,000 in U.S. (Mar. 9, 2020), https://www.cedars-sinai.org/newsroom/study-estimates-covid-19-may-have-infected-over-9000-in-us/(last accessed July 6, 2020); Sheri Fink & Mike Baker, Coronavirus May Have Spread in U.S. for Weeks, Gene Sequencing Suggests, *The New York Times* (Mar. 1, 2020), https://www.nytimes.com/2020/03/01/health/coronavirus-washington-spread.html?action=click&module=Top%20Stories&pgtype=Homepage (last accessed July 6, 2020).

nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus." PPP Regulations at 20811. The intent of the PPP is to "provide relief to America's small business expeditiously." *Id.*

33.     PPP loans provided small businesses with eight weeks of cash-flow assistance based on historical payroll information. The loans are forgivable up to the full principal amount of the loan and any accrued interest if the borrower uses the loan proceeds for certain purposes and uses at least 75% of the funds for payroll costs. *Id.* at 20813-14. This restriction was implemented "to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven." *Id.* at 20814. Amounts that are not forgiven will accrue interest at a rate of 1% with a maturity of two years. *Id.* at 20813.

34.     Unlike some other financial assistance provided in the CARES Act, the PPP provided that private lending institutions, rather than government agencies, were to accept loan applications and distribute funds. Lenders approved to make PPP funds included certain SBA-approved lenders, any federally insured depository institution or any federally insured credit union, any Farm Credit System Institution, and certain other financing providers that met specific requirements. *Id.* at 20815.

35.     To compensate lenders for participating in the program, the PPP Regulations provide that SBA will pay lenders substantial origination fees for processing PPP loans: (a) 5% for loans up to and including $350,000 (or up to $17,500 for loans in this tier); (b) 3% for loans of more than $350,000 and less than $2,000,000 (or up to $59,999 for loans in this tier); and (c) 1% for loans of at least $2,000,000. *Id.* at 20816.

36.     In order to expedite the provision of PPP loan funds to businesses in need, the PPP Regulations provide that lenders may rely on borrower certifications and attestations in order to approve a loan application, rather than independently verifying the information provided in the

application. *Id.* at 20815-16. The CARES Act specifically provides that lending institutions will not be subject to enforcement actions or penalties if the lender has received a borrower attestation. *Id.* at 20816.

37.     But because the program intentionally did not include any process for verifying borrower representations, the penalties for providing false information are severe. Knowingly making a false statement to obtain a guaranteed loan from SBA is punishable by imprisonment and fines. *Id.* at 20814. It was therefore incumbent upon small business applicants to provide truthful and accurate information in their applications.

38.     PPP applications were to be processed and funded on a "first-come, first-served" basis. Because the PPP funds were limited, submitting an accurate application as quickly as possible, before the appropriation was depleted, was critical.

39.     Because many small businesses applying for PPP funding would require the assistance of professional accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other agents in order to provide timely, truthful, and accurate representations, Congress recognized that these "agents" would need to be compensated for their work as well. *See* 15 U.S.C. § 636(a)(36)(P)(ii) ("An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.").

40.     The SBA, in turn, determined that these reasonable fees were required to be paid by the lender, in specifically delineated amounts. The PPP Regulations include express provisions for the compensation of Agents:

### c.     Who pays the fee to an agent who assists a borrower?

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

       i. One (1) percent for loans of not more than $350,000;

       ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and

       iii. 0.25 percent for loans of at least $2 million.

       The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

*Id.* at 20816.

41.    The SBA also issued a fact sheet that makes clear that Agent Fees must be paid by the lender: "Agent fees will be paid out of lender fees. The lender will pay the agent. Agents may not collect any fees from the applicant."[5]

42.    Congress and the SBA did not create a particular process or requirement that lenders or Agents were required to follow in order for the Agent to receive its portion of the fee. Creating a uniform process (and requiring all lenders to comply with additional regulations) would have slowed down implementation of the program—when its core purpose was the speedy distribution of funds to businesses—and could have incentivized lenders to prioritize applicants that did not use Agents so that lenders did not have to share their origination fees.

43.    Instead, the SBA left to the discretion of the lender how best to process applications speedily while complying with the regulations requiring them to compensate Agents for the latter's critical role in the program.

44.    But, prior to becoming an approved PPP lender, lenders were required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan.[6] That agreement requires the

---

[5] Paycheck Protection Program (PPP) Information Sheet for Lenders (Mar. 31, 2020), https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed July 6, 2020).

[6] The agreement is available for download at https://www.sba.gov/document/sba-form--cares-act-section-1102-lender-agreement.

lender to certify under penalty of perjury that it is "in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program, and PPP Loan Program Requirements."

45.     Defendants have each breached their commitment to remain in compliance with PPP Regulations. Defendants has not paid the fees of Agents for their assistance in providing accurate and truthful information on borrowers' applications. Instead, each Defendant is retaining *all* of the origination fees received from SBA for itself despite its obligation to distribute some portion of those fees to Agents. These funds are a windfall to Defendants—making them the recipients of substantial government aid that they do not need and do not deserve.

46.     Defendants did not implement any process for identifying the Agents who assisted borrowers in obtaining PPP loans from them. By failing even to ask borrowers whether they utilized the assistance of an Agent, Defendants demonstrated that they did not want to obtain any records of Agent involvement—likely hoping that the absence of such records would relieve them of the obligation to pay Agents their mandatory fees.

47.     Upon information and belief, each Defendant has adopted a company-wide policy of refusing to pay Agents their mandatory fees.

48.     Bank of America openly admits to its company-wide policy. On its website, Bank of America states that "[i]n the absence of a pre-loan approval written agreement between the agent and Bank of America, Bank of America does not pay fees or other compensation to agents who represent or assist borrowers through the Paycheck Protection Program." But nothing in the CARES Act or the PPP Regulations requires that such a pre-loan approval written agreement exist—or permits lenders to impose such a requirement.

49.     Each Defendant's policy of refusing to pay Agent Fees that are due, that lenders are required to pay, and that *only* lenders are authorized to pay, deprive Agents of their ability to receive

the payment they are owed.

50.     Each Defendant processed PPP loan applications and provided SBA loan funding to small business applicants. In return, each Defendant received or will receive hefty origination fees from the SBA as payment. Bank of America has received approval for 334,686 PPP loans, totaling over $25 billion. Assuming a conservative 1% fee, Bank of America received or is eligible to receive at least $250 million in origination fees from the SBA—and probably received more than that. Similarly, TD Bank processed and funded at least 82,225 PPP loans, totalling approximately $8.5 billion. Again assuming a 1% fee, TD Bank received or is eligible to receive at least $84 million in origination fees from the first round of PPP funding alone. North Shore Bank also processed small business PPP loan applications and provided SBA funding, entitling it to origination fees from the SBA.

51.     But rather than comply with the PPP Regulations and pay Agents their Agent Fees, each Defendant has decided to keep that money for itself.

## NAMED PLAINTIFF'S FACTS

52.     Plaintiff Antonietta Guerriero is the sole proprietor of an accounting firm, APG Accounting Services, located in Lynnfield, MA. She performs accounting services on behalf of several clients.

53.     When Ms. Guerriero's clients began asking her about the PPP in early April, she spent approximately eight hours reviewing webinars and familiarizing herself with the PPP and its requirements for small businesses so that she could assist her clients with applying. As a professional accountant, Ms. Guerriero was well positioned to ensure that her clients provided timely and accurate information to the SBA in connection with their loan applications.

### North Shore Bank

54.     In early April 2020, a client that owns two restaurants in Peabody, MA and one

restaurant in Danvers, MA, contacted Ms. Guerriero requesting assistance with a PPP loan application. Ms. Guerriero has provided accounting services for the three restaurants ("Restaurants") for the last two years.

55.     The Restaurants did not have accounts with North Shore Bank, but their owner did have a mortgage with North Shore Bank and wanted to apply for PPP funding through that institution. North Shore Bank's policy was to only provide PPP funding for small businesses with North Shore Bank accounts.

56.     Ms. Guerriero assisted the Restaurants with opening accounts at North Shore Bank. She worked directly with a North Shore Bank Vice President, Daniel Sousa, to open the accounts. She also interacted with several North Shore Bank branch employees who assisted with the account openings.

57.     In addition to opening the accounts, Ms. Guerriero assisted the Restaurants with their PPP applications. North Shore Bank required applicants to print a paper application, sign it, and scan it for submission. For each Restaurant, Ms. Guerriero gathered the required information, calculated the amount of the loan, and filled out the forms before sending them to the Restaurant owner for signature. She spent approximately three hours per Restaurant gathering payroll information and preparing the application forms for signature. North Shore Bank's application forms did not include anywhere for applicants to indicate that an Agent was assisting with the application.

58.     Ms. Guerriero also spent time communicating via email with Jerry Salerno, a Senior Vice President at North Shore Bank, regarding her clients' PPP loan applications.

59.     After the applications were submitted, one Restaurant received funding on April 13, 2020, in the amount of $220,000; the other two Restaurants received funding on April 14, 2020, in the amounts of $318,500 and $461,100.

60.     Based on the size of the loan and the PPP regulations, North Shore Bank was entitled

to receive origination fees from the SBA of $11,000, $15,925, and $13,833, respectively, for a total of $40,785.

61.    Also based on the PPP Regulations, Ms. Guerriero was entitled to Agent Fees of $2,200, $3,185, and $2,305, respectively, for a total of $7,690, which should have been paid from the origination fees that North Shore Bank received.

62.    But to date, even though multiple North Shore Bank employees (including a Vice President and a Senior Vice President) knew that Ms. Guerriero had served as an Agent with respect to the Restaurants' applications, Ms. Guerriero has not received any compensation for her substantial assistance with their PPP loan applications—assistance that inured to the benefit of North Shore Bank, which received a windfall in origination fees from the SBA. Instead, North Shore Bank's policy is not to ask whether Agents assisted with PPP loan applications and not to pay Agents the fees they are entitled to under the PPP Regulations.

63.    Ms. Guerriero has suffered financial harm as a result of North Shore Bank's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

64.    Ms. Guerriero has no recourse because she is barred from receiving compensation from the Restaurants.

*Bank of America*

65.    In addition to the Restaurants, Ms. Guerriero assisted a small business client, an air conditioning company ("AC Company") located in Everett, MA, with a PPP loan application to Bank of America. The AC Company has been Ms. Guerriero's client for approximately 20 years, and specifically reached out to Ms. Guerriero to request that she assist them with the application.

66.    On or about April 15, 2020, Ms. Guerriero spent approximately three hours gathering payroll information and other required information to submit with the PPP application.

67.    Although the SBA created a model application form, Bank of America required

applicants to submit PPP applications through its online portal. Ms. Guerriero filled in the form and submitted it on behalf of the AC Company. The Bank of America PPP application requested information about the AC Company's account and relationship with Bank of America, but did not include a field for the applicant to indicate whether an Agent had assisted with the application.

68.     On approximately May 8, 2020, the AC Company received PPP funding of approximately $90,000. Based on the size of the loan and the PPP regulations, Bank of America was entitled to receive an origination fee of $4,500.

69.     Also based on the PPP Regulations, Ms. Guerriero was entitled to an Agent Fee of $900 to be paid from Bank of America's origination fee. But to date, Ms. Guerriero has not received any compensation for her substantial assistance with her client's PPP loan application—assistance that inured to the benefit of Bank of America, which has received a windfall in origination fees from the SBA.

70.     Instead, Bank of America's policy, posted on its website, is to deny Agents the fees to which they are entitled.

71.     Ms. Guerriero has suffered financial harm as a result of Bank of America's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

72.     Ms. Guerriero has no recourse because she is barred from receiving compensation from her client.

*TD Bank*

73.     Finally, Ms. Guerriero also assisted a fifth client, the owner of an ice cream shop located in Revere, MA ("Ice Cream Shop") with a PPP loan application to TD Bank. The Ice Cream Shop already had an account with TD Bank.

74.     Ms. Guerriero spent approximately three hours assisting the Ice Cream Shop with her application by gathering the required information and calculating the loan amounts. In addition to the

application questions, TD Bank required applicants to scan and submit their drivers' licenses, which took additional time. The TD Bank application also requested information about the applicant's TD Bank account. But TD Bank's application did not request any information about whether an Agent was assisting with the application. Ms. Guerriero submitted the application on behalf of the Ice Cream Shop.

75.     In late May, approximately a week after the application was submitted, the Ice Cream Shop received PPP funding of approximately $32,000. Based on the size of the loan and the PPP regulations, TD Bank was entitled to receive an origination fee of $1,600.

76.     Also based on the PPP Regulations, Ms. Guerriero was entitled to an Agent Fee of $320 to be paid from TD Bank's origination fee. But to date, Ms. Guerriero has not received any compensation for her substantial assistance with her client's PPP loan application—assistance that inured to the benefit of TD Bank, which has received a windfall in origination fees from the SBA.

77.     Instead, TD Bank's policy is not to ask whether Agents assisted with PPP loan applications and not to pay Agents the fees they are entitled to under the PPP Regulations.

78.     Ms. Guerriero has suffered financial harm as a result of TD Bank's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

79.     Ms. Guerriero has no recourse because she is barred from receiving compensation from the Ice Cream Shop.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action on behalf of Plaintiff and the following Classes and Subclasses:

**Bank of America Class: All persons and entities in the United States who (1) served as an Agent[7] for a person or entity who applied for and received a PPP loan through Bank**

---

[7] For purposes of all of the proposed classes and subclasses, "Agent" refers to the term "agent" as it is used in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020), and the Paycheck Protection Program (PPP) Information Sheet

of America and (2) were not paid an Agent Fee by Bank of America.[8]

**Bank of America Massachusetts Subclass:** All persons and entities in Massachusetts who (1) served as an Agent for a person or entity who applied for and received a PPP loan through Bank of America and (2) were not paid an Agent Fee by Bank of America.

**TD Bank Class:** All persons and entities in the United States who (1) served as an Agent for a person or entity who applied for and received a PPP loan through TD Bank and (2) were not paid an Agent Fee by TD Bank.

**TD Bank Massachusetts Subclass:** All persons and entities in Massachusetts who (1) served as an Agent for a person or entity who applied for and received a PPP loan through TD Bank and (2) were not paid an Agent Fee by TD Bank.

**North Shore Bank Class:** All persons and entities in the United States who (1) served as an Agent for a person or entity who applied for and received a PPP loan through North Shore Bank and (2) were not paid an Agent Fee by North Shore Bank.

**North Shore Bank Massachusetts Subclass:** All persons and entities in Massachusetts who (1) served as an Agent for a person or entity who applied for and received a PPP loan through North Shore Bank and (2) were not paid an Agent Fee by North Shore Bank.

81.     The class definitions are subject to modification, including the addition of one or more subclasses, based on facts obtained in discovery.

82.     Excluded from the Classes[9] are the Defendants; any entities in which any Defendant has a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

---

for Lenders (Mar. 31, 2020),
https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed July 6, 2020).

[8] For purposes of all of the proposed classes and subclasses, "Agent Fee" refers to the agent fees described in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020).

[9] As used herein, the term "Class" encompasses the Bank of America Class, the TD Bank Class, and the North Shore Bank Class, and "Class Members" means members of the Bank of America Class, members of the TD Bank Class, and members of the North Shore Bank Class. The terms "Subclass" and "Massachusetts Subclass" mean the Bank of America Massachusetts Subclass, the TD Bank Massachusetts Subclass, and the North Shore Bank Massachusetts Subclass. The term "Subclass Members" means members of the Bank of America Massachusetts Subclass, members of the TD Bank Massachusetts Subclass, and members of the North Shore Bank Massachusetts Subclass.

83.     Plaintiff proposes that Plaintiff be appointed class representative.

84.     Plaintiff and the Classes have been harmed by Defendants' acts.

85.     Numerosity is satisfied. Upon information and belief, there are thousands of Class Members.  Individual joinder of these persons is impracticable.

86.     There are questions of law and fact common to Plaintiff and the Classes, including, but not limited to:

a.   Whether Defendants' conduct violates the CARES Act or its implementing regulations;

b.   Whether Defendants are required to compensate Plaintiff from the origination fees they are entitled to receive or have received from SBA through the PPP;

c.   Whether Defendants have a policy and/or practice of declining to pay Agents for their participation in the PPP;

d.   Whether Defendants' conduct was unfair;

e.   Whether Plaintiff and the Class Members are third-party beneficiaries of Defendants' contract with the SBA;

f.   Whether Defendants breached their contracts with SBA;

g.   Whether Defendants were unjustly enriched;

h.   Whether Defendants exercised wrongful control over Plaintiff's and the Class Members' property;

i.   Whether Defendants received money that was intended to be used for the benefit of Plaintiff and the Class Members;

j.   Whether Plaintiff and the Class Members are entitled to restitution of funds unlawfully withheld;

k.   Whether Plaintiff and the Class Members are entitled to injunctive or declaratory relief;

and

l.   Whether Plaintiff and the Class Members are entitled to damages.

87.   Plaintiff's claims are typical of the claims of Class Members.  Plaintiff and the Class Members were all harmed when Defendants refused to pay them Agent Fees under the PPP. Plaintiff's claims are not antagonistic to the claims of other Class Members.

88.   Plaintiff is an adequate representative of the Classes because Plaintiff's interests do not conflict with the interests of the Class Members. Plaintiff will fairly and adequately protect the interests of the Classes.

89.   Plaintiff has hired counsel that is skilled and experienced in class actions, including numerous complex class actions against financial institutions, and are adequate class counsel capable of protecting the interests of the Class Members.

90.   Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are likely relatively small, and it would be difficult and not economical for individual Class Members to pursue complex litigation against Defendant to recover the fees to which they are entitled. Further, individual litigation would increase the delay and expense to all parties due to the complex legal and factual issues presented in the Complaint. A class action provides easier management, the benefits of single adjudication, and economies of scale.

## CAUSES OF ACTION

### COUNT I
**Declaratory Relief**
**28 U.S.C. § 2201**
**On behalf of Plaintiff and the Classes Against All Defendants**

91.   Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

92.   Plaintiff and the Class Members are "agents" as defined by the PPP Regulations and

publications pertaining to the PPP.

93.     Plaintiff and the Class Members assisted clients with preparing applications for, and applying for, PPP loans, which were funded by one or more of the Defendants through the PPP.

94.     The PPP Regulations provide that Plaintiff and the Class Members must be compensated for that work by Defendants, from the fees that Defendants received from the SBA as compensation for participation in the program.

95.     Defendants have refused to make these payments.

96.     An actual controversy has arisen between Plaintiff and the Class Members, on the one hand, and one or more of the Defendants, on the other, because each Defendant by its refusal to pay Agent Fees to Plaintiff and the Class Members denies that it is obligated to do so.

97.     Plaintiff and the Class Members seek a declaration in accordance with PPP Regulations and the Declaratory Judgment Act that Defendants are obligated to set aside money to pay, and to pay, agents in accordance with PPP Regulations for work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

## COUNT II
### Unjust Enrichment
### On behalf of Plaintiff and the Classes Against All Defendants

98.     Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

99.     Defendants each received a benefit in the form of origination fees paid by the SBA in connection with funded PPP loans.

100.    Under the PPP Regulations and SBA guidance, a portion of those fees were to be paid to Agents, like and including Plaintiff and the Class Members, who assisted with their clients' successful PPP applications.

101.    Each Defendant is refusing to pay those Agent Fees, in contravention of PPP Regulations.

102.    Each Defendant is thus benefiting in the form of millions of dollars of origination fees, to the detriment of Agents including Plaintiff and the Class Members, by keeping the Agent Fees for itself. Each Defendant knows that it received or will receive these benefits by virtue of its participation in the PPP Program and its certification of compliance with PPP Regulations.

103.    It would be inequitable, unjust, and unfair to permit Defendants to retain the Agent Fees owed to Plaintiff and the Class Members under the PPP Regulations and SBA guidance. Plaintiff and the Class Members can reasonably expect to receive payment that is mandated by federal regulation. This is particularly so in the context of a global pandemic that has rattled the economy.

104.    Each Defendant must disgorge the portion of any and all PPP origination fees that is owed to Plaintiff and the Class Members in their capacities as Agents.

### COUNT III
### Conversion
### On behalf of Plaintiff and the Classes Against All Defendants

105.    Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

106.    Under the PPP Regulations and SBA guidance, Plaintiff and the Class Members, as Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to each Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiff's and the Class Members' clients.

107.    The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

108.    The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agents Fees.

109.    Plaintiff and the Class Members assisted their clients with applications for PPP loans

21

that were subsequently funded. Due to Plaintiff's and the Class Members' efforts, their clients were awarded PPP loans through applications to one or more of the Defendants. As such, Plaintiff and the Class Members have a right to immediate possession of Agent Fees to be paid by whichever Defendant funded their clients' loan(s).

110.    Although Plaintiff and the Class Members are entitled to Agent Fees under the PPP Regulations, each Defendant has refused to provide those fees to Plaintiff and the Class Members. Even if Plaintiff and the Class Members had requested their Agent Fees, the Defendants would have each refused the requests, because each Defendant has adopted a company-wide policy of refusing to pay Agent Fees.

111.    By retaining the Agent Fees for themselves, each Defendant has maintained wrongful control over Plaintiff's and the Class Members' property, inconsistent with their entitlements under the PPP Regulations.

112.    Each Agent Fee to which Plaintiff and the Class Members are entitled is a specific, identifiable sum, according to the amount of the PPP loan funded and the applicable PPP Regulation. Plaintiff, for example, is entitled to an Agent Fee of $900 from Bank of America, which has been wrongfully withheld; $7,690 (comprised of Agent Fees of $2,200, $3,185, and $2,305 for the three Restaurants' loans) from North Shore Bank, which has been wrongfully withheld; and $320 from TD Bank, which has been wrongfully withheld.

113.    Plaintiff and the Class Members have been injured by Defendants' wrongful exercise of dominion over their property

## COUNT IV
### Money Had and Received
### On behalf of Plaintiff and the Classes Against All Defendants

114.    Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

115.    Under the PPP Regulations and SBA guidance, Plaintiff and the Class Members, as

Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to each Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiff's and the Class Members' clients.

116.    The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

117.    The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agents Fees.

118.    Plaintiff and the Class Members assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiff's and the Class Members' efforts, their clients were awarded PPP loans through applications to one or more of the Defendants. As such, Plaintiff and the Class Members have a right to immediate possession of Agent Fees to be paid by whichever Defendant funded their clients' loan(s).

119.    Although Plaintiff and the Class Members are entitled to Agent Fees under the PPP Regulations, each Defendant has refused to provide those fees to Plaintiff and the Class Members.

120.    Each Defendant received benefits in the form of money that was intended to be paid to Plaintiff and the Class Members when it received origination fees, a portion of which were earmarked for Plaintiff and the Class Members as Agent Fees under the PPP Regulations. Each Defendant had knowledge of these benefits by virtue of its participation in the PPP and its certification of compliance with PPP Regulations.

121.    Instead of paying that money to Plaintiff and the Class Members, each Defendant kept that money for itself. Thus, the money was not used for Plaintiff's or the Class Members' benefit.

122.    Defendant has not given the money to Plaintiff or the Class Members.

123. In equity and good conscience, the Agent Fees should be paid by Defendant to Plaintiff and the Class Members.

## COUNT V
**Breach of Contract – Third Party Beneficiary**
**On behalf of Plaintiff and the Classes Against All Defendants**

124. Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

125. Upon information and belief, in order to process PPP loan applications, each Defendant entered into an agreement with the SBA.

126. The agreements required that each Defendant adhere to the PPP Regulations and certify compliance with them under penalty of perjury. The agreements between the SBA and each Defendant thus incorporate the PPP Regulations by reference.

127. As part of the agreement, each Defendant certified, under penalty of perjury, that it was in compliance and would remain in compliance with PPP Regulations that specifically require PPP lenders to pay the fees of any Agent that assists with successful PPP applications, within limits.

128. Plaintiff and the Class Members were intended beneficiaries of the agreement between the SBA and the Defendants. Thus, Plaintiff and the Class Members may enforce the promises directly made for them, including the promise to comply with PPP Regulations mandating lenders, including Defendant, to pay Agent Fees.

129. The acts of the SBA and each of the Defendants created a duty and established privity between each Defendant on the one hand, and Agents, including Plaintiff and the Class Members, on the other.

130. Nevertheless, Defendants have each breached the agreements by adopting policies of not paying Agent Fees and refusing to pay Plaintiff and the Class Members the Agent Fees to which they are entitled, conduct that violated the PPP Regulations.

131. By refusing to pay Agent Fees in accordance with PPP Regulations, Defendants are

each in violation of the terms of their agreements with the SBA, thereby damaging Plaintiff and the

Class Members.

**COUNT VI**
**Violation of Massachusetts Consumer Protection Act**
**Mass. Gen. L. C. 93A § 11**
**On behalf of Plaintiff and the Massachusetts Subclasses**

132.    Plaintiff incorporates by reference paragraphs 1 through 90 set forth above.

133.    Plaintiff and the Subclass Members are "persons who engage[] in the conduct of any

trade or commerce" within the meaning of Mass. Gen. L. c. 93A § 11.

134.    Defendants are also persons "who engage in any trade or commerce" under Mass.

Gen. L. c. 93A § 11.

135.    Each Defendant engaged in unfair methods of competition when it adopted a

companywide policy of refusing to pay Agent Fees required to be paid under the PPP.

136.    Defendants' policies of refusing to pay Agent Fees violated the requirements of the

PPP Regulations. These policies permitted Defendants to each obtain monetary benefits that were

intended to be paid to Plaintiff and the Subclass Members, that Plaintiff and the Subclass Members

had earned, and that Defendants had not earned.

137.    Defendants' policies of refusing to pay Agent Fees were and are immoral, unethical,

oppressive, and/or unscrupulous, in addition to violating the PPP Regulations and SBA Guidance.

138.    Each Defendant failed to implement a process for identifying the Agents who assisted

applicants with PPP loan applications, likely in hopes that the absence of such records would relieve

them of the obligation to pay Agents their mandatory fees. This policy of willful ignorance was unfair

and unscrupulous.

139.    Plaintiff and the Subclass Members suffered monetary harm when they were deprived

of the Agent Fees to which they were entitled.

140.    Plaintiffs request that the Court enter an injunction requiring the Defendants to

25

implement policies for identifying Agents; compel Defendants to pay to Plaintiff and the Subclass Members all damages to which they are entitled under law; and require Defendants to pay Plaintiff's reasonable attorneys' fees and costs of suit.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully prays that this Court:

a.      Enter an order certifying the Classes, appointing Plaintiff as the Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b.      Enter an order declaring that Defendant's actions and omissions, described above, are unlawful;

c.      Award all actual, consequential, compensatory, punitive, and statutory damages as available under law, including without limitation actual damages for past, present, and future expenses caused by Defendant's misconduct, lost time and interest, and all other damages suffered;

d.      An award of pre- and post-judgment interest as allowed by law;

e.      An award of reasonable attorneys' fees and expenses;

f.      The entry of injunctive and declaratory relief as necessary to protect the interests of Plaintiff and the Classes; and

g.      Such other and further relief as the Court deems reasonable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: July 6, 2020                     Respectfully submitted,

                         */s/ Katherine M. Aizpuru*
                         Katherine M. Aizpuru (Mass Bar. No. 690383)
                         Hassan A. Zavareei*
                         Andrea R. Gold*
                         TYCKO & ZAVAREEI LLP
                         1828 L Street NW, Suite 1000

Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
kaizpuru@tzlegal.com

*Counsel for Plaintiff and the Putative Class*

*\*Pro hac vice applications to be submitted*